# EXHIBIT A

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
2                      NORTHERN DIVISION
3        --------------------------
         CHRISTINE DE LEVA,            :
4                                      :
             Plaintiff,               :
5                                      :  Case Number:
         vs.                           :
6                                      :  8:21-cv-01820-DKC
         LOWE'S COMPANIES, INC.,       :
7        et al.,                       :
                                       :
8            Defendants.              :
         --------------------------
9
10          VIDEOTAPED DEPOSITION OF CHRISTINE DE LEVA
11       DATE:         March 1, 2022
12       TIME:         9:25 a.m. to 5:30 p.m.
13       LOCATION:     Seyfarth Shaw LLP
                       975 F Street, Northwest
14                     Washington, D.C. 20004
15       REPORTED BY:  Felicia A. Newland, CSR
16
17
18
19
20
21     Job No. CS5045879
```

Page 2

1                    A P P E A R A N C E S

2        On behalf of Plaintiff:

3             CHRISTINE DE LEVA, PRO SE

4        On behalf of Defendants:

5             MARGARET MANOS, ESQUIRE

6             Seyfarth Shaw LLP

7             121 West Trade Street

8             Suite 2020

9             Charlotte, North Carolina 28202

10            mmanos@seyfarth.com

11       Also Present:

12            Gene Aronov, Videographer

13

14

15

16

17

18

19

20

21

1        BY MS. MANOS:

2               Q       This is a document that your attorney

3        produced to us in this case, Ms. De Leva.  Do you

4        recognize this document?

5               A       No.

6               Q       Did you provide this document to your

7        attorney?

8               A       I'm not sure.  I gave my previous

9        attorney my paystub.  I'm not sure if this is the

10       one that I gave.

11              Q       And thank you for clarifying.

12                      And when I said your attorney, I met

13       to ask about your prior attorney --

14              A       Yes.

15              Q       -- Ms. Linda Correia.

16                      So you gave Ms. Correia one or more

17       paystubs from your Lowe's employment?

18              A       Yes.

19              Q       If you'll look at the top left corner

20       of this paystub, do you see it says Lowe's Home

21       Centers, LLC?

Page 12

1          A      Yes.

2          Q      And so that is the entity that issued

3     this paycheck to you.  Would you agree with that?

4          A      I suppose.  That's what it says.

5          Q      Do you have any evidence that Lowe's

6     Companies, Inc. was your employer and not Lowe's

7     Home Centers, LLC?

8          A      I do not have anything with me that

9     shows Lowe's Companies.

10          Q      Why did you sue Lowe Companies, Inc.

11     then?

12          A      I spoke to an attorney about this

13     case and they took it from there.  I -- I said I

14     worked for Lowe's.  I gave all of the documentation

15     that I've had from Lowe's.  Why they went for

16     Lowe's Companies, Inc., I -- I don't know.

17          Q      I'm going to go over a couple of

18     rules for the deposition now.

19               Do you understand that you've taken

20     an oath and you have sworn to tell the truth here

21     today under penalty of perjury?

Page 44

1          A       April 9th, 1975.

2          Q       Can you describe to me what formal

3     education you've had?

4          A       I finished two years community

5     college for business administration from Montgomery

6     College.

7          Q       Which college was that?

8          A       Montgomery College.

9          Q       Is that in Maryland?

10         A       Yes.

11         Q       Did you receive a degree?

12         A       I did not completely finish.  I --

13     no.

14         Q       Did you receive an associate's

15     degree?

16         A       No.

17         Q       Did you receive any degree from

18     Montgomery College?

19         A       No.

20         Q       Do you remember the approximate years

21     that you attended Montgomery College?

Page 48

1          Q     Other than your parents at that 2

2     Pettit Court address, have you lived with anyone --

3          A     No.

4          Q     -- else?

5          A     No.

6          Q     Have you ever filed for bankruptcy?

7          A     No.

8          Q     Have you ever been arrested?

9          A     Yes.

10         Q     When was that?

11         A     I was arrested March -- no, it was --

12    no.  So that was in 2013.

13         Q     Is it the approximate year you think?

14         A     That's the approximate year.  And I

15    went to court in 2014.  I don't recall the exact.

16         Q     What county was that criminal case

17    in?

18         A     That was Howard County.

19         Q     And you mentioned previously in your

20    deposition that this was a theft case --

21         A     Yes.

Page 49

1              Q      -- is that correct?

2                     Did that relate to some prior

3      employment you had?

4              A      Yes.

5              Q      Where was that prior employment?

6              A      Nordstrom.

7              Q      Tell me what you recall about the

8      theft charges stemming from your Nordstrom

9      employment.

10             A      I don't recall.

11             Q      Do you recall what the charges were?

12             A      I don't recall the exact charge.

13     Generally speaking, it was for theft.

14             Q      And so you were a defendant in that

15     criminal case?

16             A      Yes.

17             Q      Did you have a jury trial in that

18     case?

19             A      No.

20             Q      Did you have an attorney?

21             A      Yes.

Page 50

1          Q     Who was your attorney?

2          A     Joseph Murtha.

3          Q     Did you plead guilty to one or more

4     of the charges?

5          A     Yes.

6          Q     Would you please turn to Tab 7 of

7     your notebook?  And this is going to be Exhibit

8     Number 2.

9              (De Leva Deposition Exhibit Number 2

10             marked for identification.)

11    BY MS. MANOS:

12         Q     And there should be four pages to

13    this exhibit.  Do you have all four exhibits?

14         A     Yes.

15         Q     And this is Bates-labeled Defendant

16    79 through Defenant 82.

17         A     Yes.

18         Q     Does this appear to be a summary of

19    the criminal charges against you in a Howard County

20    action?

21         A     It appears to be, yes.

Page 51

1          Q     If you'd turn to the second page, do

2     you see the typed narrative under "Statement of

3     Probable Cause"?

4          A     Yes.

5          Q     Does this appear to be a summary of

6     incidents of theft that you engaged in at

7     Nordstrom?

8          A     It appears to be, yes.

9          Q     Did you engage in pass-off sales

10    transactions of merchandise to customers?

11         A     I do not recall.

12         Q     Did you engage in cash -- fraudulent

13    cash refund transactions?

14         A     I do not recall.

15         Q     Do you know whether Nordstrom had

16    security video evidence of your transactions?

17         A     I don't know.

18         Q     Did you ever see the videos in this

19    case?

20         A     I did not.

21         Q     I'm going to read a portion of this

Page 52

1    on page, it's Defendant 80.  Do you see where it

2    says, "During the course of De Leva's thefts, she

3    used two Nordstrom's credit cards issued to two

4    Nordstrom's customers, Marguerite Hemgen and Luis

5    Tully, to purchase $800 in gift cards"?

6              A    Yes.

7                   Can I object to relevance of this to

8    my case?

9              Q    Again, you're here to answer my

10   questions, Ms. De Leva.

11             A    Okay.

12             Q    And I haven't asked a question, but

13   my question is:  Did you, in fact, use two

14   Nordstrom credit cards of customers to purchase

15   gift cards?

16             A    I don't recall.

17             Q    Do you believe that this court

18   document -- do you have any reason to dispute it?

19             A    No.

20             Q    So you don't recall whether or not

21   you used customer credit cards to purchase gift

Page 53

1      cards?

2                A      No.

3                Q      Do you see at the bottom it says,

4      "Refund fraud, processed a return to a credit card

5      without receiving the merchandise"?

6                      It goes onto the next page, "Value

7      $503.50."  And then there's another statement,

8      "Processed a return to credit card without

9      receiving the merchandise, the value $1,007."

10                     Do you see those entries?

11               A      I see them.

12               Q      Did you engage in these transactions?

13               A      I don't recall.

14               Q      And do you see where it says,

15     "Merchandise pass off.  Placed merchandise in

16     customer's bag without accepting payment, value

17     $446"?

18               A      I do.

19               Q      Did you engage in that transaction?

20               A      I don't recall.

21               Q      Did you engage in any of the

1       fraudulent return or pass-off transactions that

2       Nordstrom has listed in this document?

3              A     I don't recall.

4              Q     Were you interviewed by a loss

5       prevention employee of Nordstrom regarding these

6       transactions?

7              A     I don't recall.

8              Q     What do you recall about the last day

9       of your employment at Nordstrom?

10             A     I was arrested.

11             Q     Prior to being arrested, do you

12      recall a Nordstrom employee interviewing you?

13             A     No.

14             Q     Do you think a Nordstrom employee did

15      interview you?

16             A     I don't recall.

17             Q     How did it come to be that you were

18      arrested?

19             A     Howard County police came and I was

20      taken to the back and then they took me to jail.

21             Q     Did any Nordstrom employee ask you

Page 55

1        about the transactions at issue?

2                A     I don't recall.

3                Q     Would you please turn to Tab 8 of the

4        notebook?  This will be Defendant's Exhibit 3.

5                     (De Leva Deposition Exhibit Number 3

6                      marked for identification.)

7        BY MS. MANOS:

8                Q     Ms. De Leva, we obtained copies of

9        the Howard County court proceeding from the

10       District Court of Maryland for Howard County, as

11       shown at the top of this document.

12                     Do you see on this document where it

13       says, "Theft Scheme 1,000 to under 10,000, plea:

14       Guilty"?

15               A     Yes, I see that.

16               Q     Did you, in fact, plead guilty to

17       that charge?

18               A     Yes, I did.

19               Q     It appears that you were sentenced to

20       one year and one day in jail.  Is that what you

21       recall?

Page 56

1           A      Yes.

2           Q      And then probation for three years.

3     Is that correct?

4           A      Yes.

5           Q      Is this crime a felony that you pled

6     guilty to?

7           A      I don't know.

8           Q      So you received a jail sentence of

9     one year and one day and you don't know whether

10    this is a felony?

11          A      No, I don't.

12          Q      Do you think it's a misdemeanor?

13          A      I don't know.

14          Q      Do you recall the length of the

15    sentence that you served?

16          A      No.

17          Q      Did you serve about one year?

18          A      About one year, yes.

19          Q      Could you please turn to Tab 9?  And

20    this is going to be Exhibit Number 4.

21

Page 69

1       case in Charles County, Maryland in 1994 involving

2       theft?

3               A       I don't recall.

4               Q       Did you plead guilty to that charge?

5               A       I don't recall.

6               Q       Have you ever lived in Charles

7       County, Maryland?

8               A       No.

9               Q       Have you ever been to Charles County,

10      Maryland?

11              A       I don't recall.

12              Q       Is that close to Montgomery County?

13              A       I don't believe so.

14              Q       What's the city that's the center of

15      Charles County?

16              A       I don't know.

17              Q       You don't know whether you've ever

18      been to Charles County, Maryland?

19              A       No.

20              Q       You're currently a defendant in a

21      criminal case in Frederick County, Maryland.  Is

Page 70

1        that correct?

2                A       Yes.

3                Q       What is your understanding of the

4        charges against you?

5                A       It's for theft.

6                Q       Does that theft stem from your Lowe's

7        employment?

8                A       Allegedly, yes.

9                Q       Is there a theft charge of -- let me

10       back you up.

11                       Is there a charge of theft of $100 to

12       under $1,500?

13               A       I believe so.  Is that paper in here

14       as well?

15               Q       I'm just going to go ask you the

16       questions first.

17               A       Okay.

18               Q       Is there also a charge of a theft

19       scheme of $100 to under $1,500?

20               A       I believe so, yes.

21               Q       Is it your understanding that these

Page 71

1      two charges relate to transactions you processed

2      for a Lowe's customer named Pedro Andrade in March

3      of 2021?

4              A      I'm sorry.  Could you repeat the

5      question?

6              Q      Is it your understanding that these

7      two charges relate to transactions you processed

8      for a Lowe's customer named Pedro Andrade in March

9      2021?

10             A      Allegedly, yes.

11             Q      Am I pronouncing his last name

12     correctly?

13             A      I'm not sure how to pronounce it

14     correctly.

15             Q      Do you have an attorney in this

16     Frederick County case?

17             A      Yes, I do.

18             Q      Who is that?

19             A      Joseph Murtha.

20             Q      And he was also your attorney in that

21     2004 case in Howard County?

Page 72

1          A      2014, yes.

2          Q      Does your current criminal case in

3    Frederick County involve charges of allegedly

4    fraudulent cash refunds to yourself?

5          A      No.

6          Q      Has a trial date been set?

7          A      No.

8          Q      If the court records reflect that you

9    have a trial date in April 2022, do you have any

10   reason to question that?

11         A      No.  I haven't received any

12   paperwork.

13         Q      Is it your understanding that the

14   case is going to trial?

15         A      Yes.

16         Q      And this is in Montgomery County

17   Circuit Court?

18         A      Frederick County.

19         Q      Okay.  Thank you.

20                Do you think that these charges

21   against you in the Frederick County case are false

Page 108

1          A     Yes.

2          Q     Is it your understanding that your

3    claim was denied?

4          A     I wasn't told that it was denied.

5    Every time that I called I was told that somebody

6    just hasn't looked over my claim yet and that they

7    were so backed up, that they don't -- they're not

8    allowed to give a time frame of how long it'll

9    take.

10         Q     When were you hired by Lowe's?

11         A     I believe the exact date was

12   February 5th, 2018.

13         Q     In connection with your employment

14   application to Lowe's, did you complete a

15   background check form electronically?

16         A     Electronically?  I don't remember.  I

17   don't remember the application process at Lowe's.

18         Q     Could you turn to Tab 16?  This is

19   going to be Exhibit Number 12.

20              (De Leva Deposition Exhibit Number 12

21               marked for identification.)

Page 109

1     BY MS. MANOS:

2             Q     Ms. De Leva, I'm going to represent

3     to you that this is a document produced by Lowe's,

4     which was completed by you electronically, as the

5     background check authorization form.

6                   Do you see on page 2 there's a date

7     of birth typed in?

8             A     Yes.

9             Q     Is that your date of birth?

10            A     Yes.

11            Q     And do you see on the third page

12    there is a question that says, "Have you been

13    convicted of a felony"?

14            A     Yes.

15            Q     Did you -- how did you answer that

16    question?

17            A     I don't recall.

18            Q     Have you been convicted of a felony?

19            A     Yes.

20            Q     Which was the felony?

21            A     I don't remember.

Page 110

1          Q     Do you see the question below it that

2     says, "Have you been convicted of a misdemeanor

3     within the past five years or have you completed a

4     period of incarceration within the past five years

5     for any misdemeanor"?

6          A     Yes, I see that.

7          Q     Do you recall how you answered that

8     question?

9          A     No, I do not.

10         Q     Would you turn to the fourth page,

11    the final page?  Do you see it says, "Date added

12    January 23rd, 2018"?

13         A     Yes.

14         Q     Do you recall that you submitted your

15    application to Lowe's around that time?

16         A     I don't remember.

17         Q     Well, you began employment on

18    February 5th, 2018, right?

19         A     Yes.

20         Q     And so do you think you submitted

21    your application around late January of 2018?

Page 111

1           A      I'm not sure.

2           Q      Is it possible you submitted your

3      application in late January of 2018?

4           A      I definitely applied before

5      February 5th.  I don't know when.

6           Q      The incarceration we talked about

7      earlier stemming from the Nordstrom theft

8      charges --

9           A      Uh-huh.

10          Q      -- you had been incarcerated in 2015,

11     correct?

12          A      Yes.

13          Q      And so you just completed this

14     employment application in January of 2018, it looks

15     like.  Would you agree with that?

16          A      Approximately, yes.

17          Q      And so within the past five years, at

18     the time of this application, you had been

19     incarcerated.  Is that correct?

20          A      Yes.

21          Q      Do you recall if you said yes to this

Page 112

1      question?

2                A      No.

3                Q      You don't recall?

4                A      I do not.

5                Q      Is that an accurate statement that

6      you had been incarcerated within the past five

7      years?

8                A      Of putting in my application?

9                Q      Yes.

10               A      Yes.

11               Q      And it's also an accurate statement

12     that you've been convicted of a felony?

13               A      Yes.

14               Q      What was your first position with

15     Lowe's?

16               A      Seasonal associate.

17               Q      And was that part time?

18               A      I believe so, yes.

19               Q      And which Lowe's store was that at?

20               A      The Gaithersburg, Maryland store.

21               Q      About how long did you hold that

Page 113

1       position?

2                A       Approximately six or seven months.

3                Q       And at some point did you become a

4       full-time employee of Lowe's?

5                A       Yes.

6                Q       And what was the position at that

7       time?

8                A       Pro CSA.

9                Q       Does "CSA" stand for customer service

10      associate?

11               A       Yes.

12               Q       So that was Pro services customer

13      service associate?

14               A       Yes.

15               Q       How long did you hold that position?

16               A       Until I was promoted to the Frederick

17      store in February of 2019.

18               Q       So you started Lowe's employment in

19      February 2018.  You were promoted in February 2019.

20      So it sounds like you were a store seasonal

21      employee for about six months and then a Pro CSA

Page 114

1      for about six months?

2                 A      Yes.

3                 Q      Would you please turn to Tab 17?

4      This is going to be Exhibit Number 13.

5                      (De Leva Deposition Exhibit Number 13

6                       marked for identification.)

7      BY MS. MANOS:

8                 Q      Does this appear to be a job

9      application that you submitted for a store seasonal

10     employee?

11                A      It appears that way, yes.

12                Q      And if you go to the final page,

13     Defendant 158, it looks like you submitted it

14     around January 23rd, 2018, right?

15                A      It appears that way, yes.

16                Q      What did you list as your race there

17     in the final page?

18                A      Native Hawaiian or Pacific Islander,

19     not Hispanic or Latino.

20                Q      Turning back to the first page.  Do

21     you see under "experience" it states, "2014 - 2018,

Page 121

1          Q      And you don't recall the person's

2      name?

3          A      No.

4          Q      Did you receive any awards while

5      employed by The Home Depot?

6          A      Yes.

7          Q      What types of awards did you receive?

8          A      They were Homer badges and bonuses,

9      for sales or certain things that I excelled in.  I

10     don't know off the top of my head exactly every

11     single one.

12         Q      How did your employment with The Home

13     Depot end?

14         A      I was terminated.

15         Q      What was the reason Home Depot

16     provided for your termination?

17         A      Misconduct.

18         Q      And what specifically was the

19     misconduct they told you it was?

20         A      I don't recall.

21         Q      Did you, in fact, engage in

Page 125

1    Q    Do you recall -- and Mr. Bowden was

2  at the Frederick store, right?

3    A    Yes.

4    Q    Do you recall who at the Gaithersburg

5  store was your supervisor when you were a CSA in

6  Pro?

7    A    The Gaithersburg Pro service

8  department did not have a supervisor.  My direct

9  supervisor -- my direct manager was Thelston J.

10  Rigby.  He was the assistant manager over Pro

11  services department.

12    Q    At some point did you become a sales

13  specialist in Pro services at the Frederick store?

14    A    Yes.  I was promoted by Thelston in

15  the Frederick store in February 2019 to a Pro sales

16  specialist.

17    Q    Did you apply for that position of

18  Pro services sales specialist at the Frederick

19  store?

20    A    Yes.

21    Q    If you would turn to Tab 24.  This is

Page 128

1           A      Yes.

2           Q      And it says, "Current manager's name

3      Aaron."

4           A      Yes.

5           Q      Was there someone named Aaron who was

6      your manager at that time?

7           A      Aaron is an assistant manager.

8      Thelston had left the Gaithersburg store to go to

9      the Frederick store.  When he left, Aaron became

10     the acting assistant store manager for the lumber

11     Pro services department.

12          Q      And it looks like you submitted this

13     application on February 5th, 2019.  Does that seem

14     accurate to you?

15          A      That's approximate, yes.

16          Q      When you began your position as Pro

17     services sales specialist, who was your direct

18     supervisor?

19          A      Jeffrey Bowden.

20          Q      Was Mr. Rigby your direct supervisor

21     at any point once you were at the Frederick store?

Page 143

1      to that you grieved your concerns to?

2              A     Jeffrey Bowden and Thelston J. Rigby.

3              Q     When did you express your concerns to

4      Jeffrey Bowden?

5              A     Immediately after Jeffrey Nyswaner

6      showed Paul Lewis and I his paystub.

7              Q     So it was after Mr. Nyswaner began

8      his employment as a Pro services sales specialist?

9              A     Yes.

10             Q     Do you know when Mr. Nyswaner showed

11     his paystub?

12             A     It was approximately November of

13     2019.

14             Q     And what concerns did you express to

15     Mr. Bowden?

16             A     I expressed that I was promoted to

17     sales specialist before Jeffrey Nyswaner.  We had

18     both applied for the position at the same time, and

19     Thelston had chosen me, to promote me first.  And

20     my concern was if he was promoted after me with no

21     experience as a Pro sales specialist, how was he

1     paid immediately more than me as soon as he became

2     a sales specialist?

3              Q     Did you express any concern about

4     Mr. Paul Lewis to Jeffrey Bowden?

5              A     No, I didn't.  Paul has been at the

6     store since 1999, and I did not have a problem with

7     Paul's pay as long as he had been with the company

8     as a Pro sales specialist.

9              Q     Did you know what Paul Lewis' pay was

10    at the time you expressed concerns to Jeffrey

11    Bowden?

12             A     At the time he did mention what he

13    made.  Whether it was accurate or not, I don't

14    know.

15             Q     Do you recall now what the number

16    was?

17             A     $24.24.

18             Q     And you said you saw Mr. Nyswaner's

19    rate on a paystub?

20             A     Yes.  We were able to pull up

21    paystubs the Wednesday before we actually got paid

Page 145

1      on the work computers.

2              Q       Was that through a specific software

3      program?

4              A       I believe it's called Workday.

5              Q       So this was electronically that

6      Mr. Nyswaner showed you his paystub?

7              A       Yes.

8              Q       And that was in November of 2019?

9              A       Approximately.

10             Q       And so you saw his specific hourly

11     rate at that time?

12             A       Yes.

13             Q       What was the context for him showing

14     his paystub?

15             A       He said that he had never been paid

16     so highly to do the least amount of work anywhere

17     in his life.  He came off as bragging.  And it was

18     pretty much to that extent.

19             Q       Was anyone else present when he said

20     these things and showed you the paystub?

21             A       Yes, Tanzania Sanchez and Paul Lewis.

1       was no specific name.

2               Q     Looking further down in that box, do

3       you see it says, "I believe I was discriminated

4       against because of my sex (female) and race

5       (Asian)."

6                     Do you see that?

7               A     Yes.

8               Q     And so you alleged race and sex

9       discrimination in this charge, correct?

10              A     Yes.

11              Q     What is your race?

12              A     I'm Asian.

13              Q     And you did not mention or allege

14      national origin discrimination, correct?

15              A     No.

16              Q     Is that a no?

17              A     No.

18              Q     Let's go to Tab 28, please.  This is

19      going to be Exhibit 18.

20                    (De Leva Deposition Exhibit Number 18

21                     marked for identification.)

Page 160

```
 1              A      Yes.

 2              Q      -- over your team?

 3                     So he was not performing the same or

 4       equal work as you were performing?

 5              A      No.

 6              Q      Do you see then where it goes on to

 7       say, "On March 26th, 2021, I spoke with my Store

 8       Manager (Scott Willis) and informed him that I was

 9       disappointed with the raise and that I was again

10       the lowest paid PSS.  Mr. Willis said he would

11       speak with his supervisor and get back in touch

12       with me"?

13              A      Yes.

14              Q      Is that accurate?

15              A      Yes.

16              Q      Tell me about what you recall of that

17       conversation on March 26, 2021.

18              A      When I had originally gone to Scott

19       Willis to ask about my pay raise, and he said that

20       he had looked out for me, that I was one of the

21       very few that he overrode the system to give a
```

1    higher raise than what, you know, it automatically

2    would give.  He told me that I would be extremely

3    happy with what I saw.  And that I would see it on

4    the following pay period.  And we would wait to

5    have this conversation until I see what he gave me.

6    And if I was disappointed, we would have that talk

7    then.

8                    So I saw it once again.  And everyone

9    spoke of -- or, you know, I saw everyone's raises,

10   and so I disappointed.  And I had gone to him

11   to ask him, you know, "I thought you said that you

12   looked out for me.  I was one of the few that you

13   overrode the system."  And he said that Dustin, the

14   acting district manager, was the one that limited

15   my raise.

16                   So I asked him, I said, "You overrode

17   the system, that you looked out for me."  Because

18   Dustin was new, he was just promoted to district

19   manager.

20                   And Scott said, "No, no, no.  That's

21   my boss.  Dustin is my boss.  I'm going to talk to

Page 162

1       him."  He said, "It's Friday.  I know you're off on

2       the weekend, I'll get to you on -- I'll make sure I

3       talk to him over the weekend and I'll get back to

4       you Monday with what we can do."

5                   But he said he completely agreed, you

6       know, that it should be more, but that it was

7       Dustin -- I believe the last name is Cornell --

8       that gave me that raise rate.

9            Q      Do you recall anything else about

10      that March 26, 2021 conversation with Mr. Willis?

11           A      Yes.  I told him that I had spoken to

12      Keith Clarke, my previous store manager at the

13      Gaithersburg store, and that I was interested in

14      going back if things didn't work out in -- in

15      Frederick.  And I want to say he told me do what I

16      have to do, but he would get back to me on Monday.

17                  So when I went back to the desk after

18      speaking to him is when I applied to the

19      Gaithersburg store, because I had spoke to Keith

20      Clarke, he said, "Let me know if you want to do it.

21      I'm going to post the position.  As soon as I post

Page 163

1    the position, apply for it."  He would take it down

2    and we would go from there.

3          Q    Do you recall anything else about

4    that conversation with Mr. Willis?

5          A    I don't recall anything else.

6          Q    What about the prior conversation,

7    the one with Mr. Willis where you asked about your

8    raise and he indicated you would see it on the next

9    pay period check, do you remember anything else

10   about that conversation?

11         A    Not that I recall right now.

12         Q    Was anyone else present for either of

13   these conversations?

14         A    No.

15         Q    So when you saw the pay information

16   for Mr. Nyswaner and Mr. Lewis, were you able to

17   see the percentage rate they received or just the

18   current hourly rate?

19         A    It -- I believe it was the current

20   hourly rate.

21         Q    So you would know then if your

Page 66

1          A      Yes.  I live on Lake Katrine Terrace.

2          Q      7417?

3          A      Yes.

4          Q      Is this document referring to you

5    then?

6          A      I have never seen this document

7    before.

8          Q      Do you see this document shows, down

9    in the narrative comments it states, "Christine De

10   Leva was arrested on or about September 6, 2013" --

11   okay, actually, let me go up and see -- do you see

12   it says, "Date sentenced, June 7, 2005"?

13         A      Yes, I see that.

14         Q      Do you recall writing a letter to a

15   judge when you were incarcerated --

16         A      No, I don't.

17         Q      -- asking the judge to revise your

18   sentence?

19         A      I don't remember.

20         Q      What were you doing in June of 2005?

21   Were you employed somewhere?

Page 168

1      accurate?

2              A      Yes.  He didn't say anything more

3      than, "You're terminated and I have to escort you

4      out of the store."

5              Q      Was anyone else present when he said

6      that?

7              A      Jasmine Summers.

8              Q      And what is your understanding of the

9      reason you were terminated?

10             A      My understanding at that time was

11     using my supervisor's log-in credentials.

12             Q      Do you have a different understanding

13     of the reason as you sit here today?

14             A      I don't know the exact reason.

15             Q      Do you see in the final Roman Numeral

16     there 10, it says, "I have been subjected to

17     discrimination because of my sex (female) and race

18     (Asian)"?

19             A      Yes.

20             Q      And so you're alleging discrimination

21     based on your sex and race as you were in your

Page 169

1      initial charge, correct?

2              A      Yes.

3              Q      And, again, you did not mention

4      national origin discrimination, did you?

5              A      I did not.

6              Q      And it's not anywhere on this charge,

7      is it?

8              A      Not on this charge, no.

9              Q      Did you check the box for national

10     origin discrimination?

11             A      I don't recall.  I don't recall doing

12     that.

13             Q      Is the box for national origin

14     discrimination checked with an "X" mark?

15             A      It is not.

16             Q      You also allege in this amended

17     charge that the reason for your termination was a

18     pretext for Lowe's actual motivations of when to

19     retaliate against you for complaining of pay

20     discrimination.

21                    Do you see that in Roman Numeral, I

Page 173

1     at the store, and then I never heard back from him.

2     He would not return my calls.  I even went to the

3     store, they said that he was busy.  So that is why

4     I felt that way.

5               Q     Did someone tell you that

6     Mr. Robinson gave a negative reference?

7               A     No.

8               Q     And so you're assuming that?

9               A     Yes.

10              Q     But you have no facts to support that

11    belief?

12              A     No, I have not talked to Steven.

13              Q     So I want to talk about your

14    interview with Mr. Rigby for your Pro specialist

15    position.

16                    You mentioned that Mr. Rigby is the

17    person who promoted you.  Is that --

18              A     Yes.

19              Q     -- correct?

20                    And did you receive an interview for

21    the Pro services sales specialist position before

Page 174

1      your promotion?

2              A     Yes.  It was a phone interview.

3              Q     When was that interview?

4              A     I don't recall the exact day.

5              Q     Would it have been around January or

6      February of 2019, you think?

7              A     I would say January 2019.

8              Q     And where was the interview

9      conducted?  You said it was by phone?

10             A     By phone.  I was in the Gaithersburg

11     store and he was in the Frederick store.

12             Q     Was it just Mr. Rigby present?

13             A     Yes.

14             Q     And so if it was by phone, you

15     wouldn't have had any documents to give to them --

16     him.  Is that correct?

17             A     Correct.

18             Q     Did you have any documents with you

19     during the interview such as a resume?

20             A     No.

21             Q     What did you discuss with Mr. Rigby

Page 191

1      late 2019?

2             A     No, I don't.  It should be in the

3      system though.

4                   MS. MANOS:  Do you want to take a

5      break?  We'll take a quick break just to switch out

6      the videotape.

7                   VIDEOGRAPHER:  We are going off the

8      record.  This is the end of Media Unit Number 4.

9      The time is 2:03.

10                  (Recess from 2:03 p.m. to 2:05 p.m.)

11                  VIDEOGRAPHER:  We are back on the

12     record.  This is the beginning of Media Unit Number

13     4.  The time is 2:05 p.m.

14     BY MS. MANOS:

15            Q     Ms. De Leva, could you please turn to

16     Tab 33?

17                  MS. MANOS:  And this will be Exhibit

18     Number 22.

19                  (De Leva Deposition Exhibit Number 22

20                   marked for identification.)

21

Page 192

1      BY MS. MANOS:

2              Q       This has been Bates-labeled Defendant

3      1439 to 1440.  You had mentioned sending an e-mail

4      to John Rolison?

5              A       Yes.

6              Q       Is this a copy of your e-mail to

7      Mr. Rolison?

8              A       It looks like it, yes.

9              Q       And it looks like you first e-mailed

10     something -- the e-mail to yourself, and then the

11     following week or so you e-mailed it to

12     Mr. Rolison.  Is that what you recall doing?

13             A       I recall sending myself an e-mail, as

14     well as John Rolison.

15             Q       So if you look at the top of this

16     exchange, it looks like you e-mail Mr. Rolison on

17     November 20th, 2019.  Does that look correct to

18     you?

19             A       Where do you see that?  Oh, okay.

20             Q       Is that your recollection of when you

21     e-mailed Mr. Rolison?

Page 193

```
 1              A     I don't remember the exact day and
 2       time.  I don't remember the exact day and time.  I
 3       know that I copied myself.
 4              Q     Would you agree that this document
 5       shows that you sent an e-mail to John Rolison on
 6       November 20th, 2019?
 7              A     Yes, that's what it says.
 8              Q     And the text below, is that the
 9       e-mail that you're talking about?
10                    Is that the substance of the e-mail
11       that you sent to Mr. Rolison?
12              A     Yes.
13              Q     And was Mr. Rolison a district HR
14       official at that time?
15              A     Not to my knowledge.  I was told that
16       he was corporate HR.
17              Q     If you look in your e-mail, do you
18       see, a couple of sentences in, it says, "My
19       previous employer prior to Lowe's was your number
20       one competitor, The Home Depot.  I was employed
21       there from 2013 to 2018 as a Pro Account Sales
```

Page 194

1    Associate, PASA"?

2              A      Yes, I see that.

3              Q      Is that an accurate statement?

4              A      No, that's not an accurate statement.

5              Q      What's not accurate about that

6    statement?

7              A      I don't recall the exact time I was

8    at Home Depot.

9              Q      So you're telling Mr. Rolison in this

10   e-mail that you were employed there for five years,

11   correct?

12             A      That's what it says, yes.

13             Q      But that's not correct?

14             A      I don't recall the amount of time I

15   was at The Home Depot.

16             Q      But if you look down to the last

17   sentence in that paragraph, the first paragraph, do

18   you see it says, "I feel I am being discriminated

19   against because of my sex"?

20             A      Yes.

21             Q      And then again on the second page,

Page 195

1      you say, "I truly believe I am being discriminated

2      against because of my sex"?

3           A     Yes.

4           Q     And you don't mention anything about

5      race in this e-mail, correct?

6           A     No, I do not.

7           Q     Or about national origin, correct?

8           A     Correct.

9           Q     And the person whose pay rate you

10     mentioned in this e-mail, other than your own, was

11     that Mr. Nyswaner?

12          A     Yes.

13          Q     Could you please turn to Tab 34?

14               MS. MANOS:  This will be Number 23.

15            (De Leva Deposition Exhibit Number 23

16              marked for identification.)

17     BY MS. MANOS:

18          Q     Would you agree that this exchange

19     shows you e-mailed Mr. Rolison on November 20th,

20     and the next day, November 21st, 2019, Mandi

21     McWhirt acknowledged receipt of your e-mail?

Page 196

1          A     Yes.

2          Q     And she lets you know that she would

3     be partnering with the associate relations team to

4     look into your concerns, correct?

5          A     Yes.

6          Q     Please turn to Tab 35.  This will be

7     Number 24.

8               (De Leva Deposition Exhibit Number 24

9                marked for identification.)

10    BY MS. MANOS:

11         Q     Does this appear to be an e-mail from

12    Associate Relations Consultant Marsha Poston to

13    you?

14         A     Yes.

15         Q     Is Ms. Poston the employee who

16    investigated your pay concerns expressed to

17    Mr. Rolison?

18         A     I believe so, yes.

19         Q     Well, did Ms. Poston interview you?

20         A     She did not interview me.

21               What do you mean by interview?

Page 206

1        Q    Let's turn to Tab 37, please.   And

2    this is going to be Number 26.

3             (De Leva Deposition Exhibit Number 26

4             marked for identification.)

5    BY MS. MANOS:

6        Q    Ms. De Leva, this is a document that

7    we received from Home Depot in response to a

8    subpoena we issued to them in this case.   And we

9    produced these documents to you.

10            Do you see that this document states

11   your name and the last four digits of your Social

12   Security number?

13       A    Yes, I see that.

14       Q    And it also states your correct

15   address in Gaithersburg, Maryland?

16       A    Yes, I see that.

17       Q    And is that also your phone number

18   beginning with 240?

19       A    It is.

20       Q    And it states "Pro Account Sales

21   Associate."   Do you see that?

Page 207

1          A      Yes.

2          Q      Was that your position with Home

3    Depot?

4          A      Yes.

5          Q      And is that your date of birth listed

6    there?

7          A      Yes.

8          Q      And you see it says "Employee Status:

9    Terminated"?

10         A      Yes.

11         Q      And it says "Original Hire Date:

12   February 5th, 2016."  Do you see that?

13         A      I see that.

14         Q      Is that correct that you did not

15   begin employment with Home Depot until February of

16   2016?

17         A      I don't recall.

18         Q      Do you have a reason to question the

19   accuracy of this Home Depot personnel record?

20         A      I don't know.  I don't recall that

21   date.

Page 208

1           Q     Do you see this document states,
2      "Last Day Worked:  May 12th, 2017"?
3           A     Yes, I see that.
4           Q     Do you recall that that was when your
5      employment ended with Home Depot?
6           A     No, I don't recall that.
7           Q     Is it possible that is when your
8      employment ended with Home Depot?
9           A     I don't know.
10          Q     Do you have a reason to question the
11     accuracy of that date on this Home Depot personnel
12     record?
13          A     I don't know.  I don't recall my last
14     day worked.
15          Q     Based on this personnel record from
16     Home Depot then, it appears that you only worked
17     there for one year and about three months.  Would
18     you agree with that?
19          A     Well, based on this paper, yes.
20          Q     And that you were terminated for
21     conduct or policy violation.  Would you agree with

Page 209

1          that?

2                    A       Yes.

3                    Q       So if this information -- this Home

4          Depot document is correct, then the information in

5          that resume that we just looked at would not be

6          correct.  Would you agree with that?

7                    A       If this paper is correct, yes.

8                    Q       Because you were not employed by Home

9          Depot for five years, were you?

10                   A       I don't recall.

11                   Q       Well, this document says you were

12         employed for one year and three months, right?

13                   A       Yeah, I don't know where this

14         document actually came from.  I've never seen this

15         document before.

16                   Q       Do you have any pay statements from

17         Home Depot showing you were employed for more than

18         one year and three months?

19                   A       Not that I know of, no.

20                   Q       Any other documents that show the

21         length of your employment there?

Page 217

1          Q     Do you know anything about

2     Mr. Nyswaner's work history prior to Lowe's?

3          A     He's mentioned some things.  I don't

4     recall exactly what.

5          Q     Do you know whether he has more than

6     one year and three months of experience in

7     commercial sales before Lowe's?

8          A     He does not.

9          Q     You don't think he has a year of

10    commercial sales experience before Lowe's?

11         A     He has told me that he has never done

12    commercial sales.  So if he lied to me, then

13    that's -- then he lied.

14         Q     Have you seen Mr. Nyswaner's resume?

15         A     No, I have not.

16         Q     Would you please turn to Tab 41.

17    This will be Exhibit 29.

18              (De Leva Deposition Exhibit Number 29

19               marked for identification.)

20    BY MS. MANOS:

21         Q     Do you recognize this exhibit, these

Page 218

1          two pages, Ms. De Leva?

2                    A     Yes, texts with Akiel Baptiste.

3                    Q     Could you spell his name for the

4          record?

5                    A     A-K-I-E-L, B-A-P-T-I-S-T-E.

6                    Q     Who is Mr. Baptiste?

7                    A     I knew him as the regional Pro sales

8          manager.  I don't know if that is accurate as to

9          what his position is.

10                   Q     So did you work with Mr. Baptiste

11         when you were a Pro services sales specialist at

12         the Frederick --

13                   A     Yes.

14                   Q     -- store?

15                         And you said these are text message

16         exchanges that you had with Mr. Baptiste?

17                   A     Yes.

18                   Q     If you look at the top of this first

19         page here, do you see the exchange -- and it looks

20         like it's your text to him in green -- where you

21         say, "I just spoke with Scott about my raise"?

Page 219

1          A      Yes.

2          Q      And it looks like you sent that on

3     March 8th, 2021 --

4          A      Yes.

5          Q      -- correct?

6                 And so did you tell Mr. Baptiste what

7     you explained earlier in your deposition, that you

8     had spoken to Scott Willis and he told you that you

9     should wait to receive -- or see your raise, but

10    you would be happy with it?

11         A      Yes.

12         Q      Other than this text exchange, did

13    you have -- prior to this text exchange, did you

14    have any conversations with Mr. Baptiste about your

15    pay concerns?

16         A      Yes.

17         Q      What conversations did you have with

18    him?

19         A      I don't recall exactly.

20         Q      Generally, what kind of conversations

21    did you have with Mr. Baptiste about your pay

Page 220

1    concerns?

2         A     Akiel had told me to think of what I

3    wanted to get paid hourly because I was doing so

4    well in sales and to ask Scott for that.  Other

5    than that, I don't recall everything that we spoke

6    about.

7         Q     Did you share with Mr. Baptiste that

8    Mr. Nyswaner was paid more than you at some point?

9         A     Yes.

10        Q     If you will turn to the second page

11   of this exhibit, do you see a text that you sent to

12   Mr. Baptiste on March 23rd, 2021 saying, "Waiting

13   to see what the paycheck says on Wednesday, LOL"?

14        A     Yes.

15        Q     Is this the time period you talked

16   about when you were waiting to see how much of an

17   increase you would get in March 2021?

18        A     Yes, it should be.

19        Q     Did you have any other text exchanges

20   with Mr. Baptiste besides the ones that we just

21   looked at about your pay?

Page 225

1                    VIDEOGRAPHER:  We are back on the

2       record.  This is the beginning of Media Unit Number

3       5.  The time is 2:55 p.m.

4       BY MS. MANOS:

5            Q     Ms. De Leva, at some point during

6       your employment with Lowe's, did you learn that the

7       Lowe's Asset Protection Team had been investigating

8       your conduct?

9            A     On the day I was terminated.

10           Q     Tell me what you recall about that

11      meeting with Chris Dang, the day you were

12      terminated?

13           A     I remember being taken to the back

14      office, Nadiyyah's office, the staff scheduler's

15      office in the back with TJ, Terrence Hopkins.  He

16      opened the door and Chris Dang and Jasmine Summers

17      were both in the office.  There was paper taped to

18      the window of the door.

19                    When he opened the door and I stepped

20      in, he closed the door.  And they told me to sit in

21      the chair across from the door and they both sat

Page 226

1      directly in front of the door.

2              Q     How big approximately was this

3      office?

4              A     Not that big.  Approximately -- I'm

5      five-four, so I'm going to say a six-by-nine

6      office, six-by-ten.

7              Q     Was it a tight fit to fit three

8      people in there?

9              A     A very tight fit.  There was a desk,

10     cabinets, filing cabinet, chairs.  It was very

11     tight.

12             Q     Was the staff scheduling office

13     within another office within the store?

14             A     It was behind the -- I guess it's a

15     meeting room.  I don't know what you would call it.

16     It's not the breakroom, it's just where the one

17     large table like this and everyone sits for

18     meetings is.  It's off to the side.

19             Q     So was there sort of a training room

20     next to the staff scheduling office?

21             A     Yes.

Page 231

1       Progress" or anything?

2              A      It was just a paper that was taped to

3       the -- there was no sign, nothing was written, it

4       was just paper taped onto the window part of the

5       door.

6              Q      How close were you seated to the door

7       that you're describing where people were coming by?

8              A      In feet, I was against the wall, the

9       door, I would say, is about six feet away.

10             Q      So could you have reached your arm

11      out and touched the door with your fingers?

12             A      Sitting where I was, no.

13             Q      To get to the door, would you have

14      to -- had to have gotten up and taken a few steps?

15             A      Yeah.  A couple of steps, yes.

16             Q      At any time during this meeting with

17      Chris Dang, did you attempt to leave the room?

18             A      I did.

19             Q      When was that?

20             A      When Chris Dang had left the office.

21      I don't know what he was doing.  He said he would

Page 232

1     be back.  I got up and Jasmine asked me where I was

2     going.  I said I wanted to call my mom, she said I

3     was not allowed to use my cellphone.  I wasn't

4     allowed to leave the room.  And if I just

5     cooperated, it would be -- it would go faster.  We

6     were in there for a few hours, so I wanted to let

7     somebody know where I was.

8          Q     Did Chris Dang say anything to you

9     about not leaving the room?

10          A     He didn't say anything about not

11     leaving the room.  He just kept leaving the room.

12          Q     Did you ever ask Chris Dang if you

13     could leave the room?

14          A     No.  The one time I -- he wasn't in

15     there when I -- the one time I wanted to leave the

16     room.

17          Q     If you would turn to Tab 44, please.

18     This will be Exhibit Number 32.

19               (De Leva Deposition Exhibit Number 32

20               marked for identification.)

21     BY MS. MANOS:

Page 233

1          Q     Do you recognize this document,

2     Ms. De Leva?

3          A     Yes.

4          Q     What is this document?

5          A     This is the statement Chris Dang had

6     me write the day I was terminated.

7          Q     So did you handwrite this document on

8     March 29, 2021?

9          A     Yes.

10         Q     Is that your signature at the bottom

11    next to your name?

12         A     Yes.

13         Q     And this is a two-page handwritten

14    statement, correct?

15         A     Correct.

16         Q     Did you write the times on this

17    document?  It says "9:44 a.m." on page 1, and it

18    says "10:15 a.m." on page 2.

19         A     Yes.

20         Q     Are those the times that you started

21    writing the statement and ended writing it?

Page 234

1          A     Yes.

2          Q     And so did you write this during the

3     meeting that you had with Chris Dang?

4          A     Yes.  I was called to the back at

5     8:00 a.m.  So after Chris spoke on everything he

6     needed to speak on, then he told me that I needed

7     to write this statement.

8          Q     You were called to the back at 8:00

9     a.m.?

10          A     Yes.

11          Q     When did your shift start that day?

12          A     7:00 a.m.

13          Q     When did you enter the room with

14     Chris?

15          A     TJ came.  It was, I want to say,

16     exactly 8:00 a.m., so I just walked to the back.

17     So that would only take a couple of minutes.

18          Q     So you think you entered the room

19     with Chris Dang and Jasmine around 8:00 a.m.?

20          A     Yeah.  Give or take, yes.

21          Q     If you look down to the third

Page 255

1          A      I don't know.  You would have to

2      ask -- I don't know.  I don't know.

3          Q      Would you keep receipts inside the

4      register?

5          A      I have put returned receipts -- I've

6      put returned receipts on damaged-item receipts.

7      I've put receipts into the register.

8          Q      And where inside the register have

9      you put them?

10         A      You would just put it in a -- in any

11     of the slots.  There's no particular slot for

12     receipts, but you can put the receipt in there.

13         Q      Are you able to tell me which bill is

14     on the far left of the register?  Do you recall?

15         A      No.

16         Q      But it appears you're pulling out

17     something from the far left compartment.  Were one

18     hundred dollar bills kept over there, let's say,

19     or --

20         A      I don't recall.

21         Q      -- there wasn't a specific spot

Page 256

1      for --

2               A     No.

3               Q     -- specific bills?

4                     Had you seen that video before?

5               A     No.

6                     MS. MANOS:  This next video is going

7      to be Exhibit 34.

8                     (De Leva Deposition Exhibit Number 34

9                     marked for identification.)

10     BY MS. MANOS:

11              Q     Ms. De Leva, we produced this video

12     to you as well in our discovery responses.

13                    Is that Pedro Andrade who walked up

14     to your register?

15              A     It looks like him.

16              Q     And is this you on the video?

17              A     It looks like me.

18              Q     And, again, this is part of the Pro

19     desk?

20              A     Yes.

21              Q     And in the interest of time, I'm

Page 265

1      notes at all?

2              A      No.

3              Q      After your meeting with Mr. Dang

4      concluded on March 29, 2021, did you meet with

5      anyone else in the staffing scheduler's office that

6      day?

7              A      Other than the Frederick County

8      police officers?  There was two officers that came

9      in.  I believe it's Officer Testerman, is the one

10     that's on my charging papers.  Other than them, no.

11             Q      So you met with two Frederick County

12     law enforcement --

13             A      Yes.

14             Q      -- professionals?

15                    What did they discuss with you?

16             A      They asked me for Pedro Andrade's

17     address, phone number.  And I told Jasmine that it

18     was in, you know, the managed accounts system.  She

19     didn't know how to get in there, so I told her how

20     to get in.  And they found it and they wrote down

21     his full name, company name, address, and phone

Page 266

1     number and they left.

2            Q     Do you recall discussing anything

3     else with the two officers?

4            A     The officer told me that I was not

5     being arrested, that they were going after Pedro

6     Andrade.

7            Q     Do you recall which officer said

8     that?

9            A     Testerman.

10           Q     He said that they were not arresting

11    you and that they were going after Andrade?

12           A     I asked him if I was getting

13    arrested, he said, "No, we are not arresting you.

14    We want the information to go after Pedro Andrade."

15           Q     Do you recall anything else about

16    that conversation?

17           A     No, they left.  And then Scott Willis

18    came in and said, "Unfortunately, we have to

19    terminate you.  I need to escort you off the

20    property."  And that's it.

21           Q     Was anyone else present for that

Page 285

1           Q     Ms. De Leva, this is a document that

2      Nordstrom produced to us in response to our

3      subpoena to them in this case, which we produced to

4      you.

5                 Do you see that this form appears to

6      be your acknowledgment of your receipt of employee

7      materials when you began employment with Nordstrom?

8           A     That's what it says, yes.

9           Q     Do you see the date May 9th, 2013?

10          A     Yes.

11          Q     Do you think that's around the time

12     you began employment with Nordstrom?

13          A     I don't know the date.

14          Q     Would you please turn to Tab 53?

15     This will be Exhibit 41.

16                (De Leva Deposition Exhibit Number 41

17                 marked for identification.)

18     BY MS. MANOS:

19          Q     This is another document that

20     Nordstrom produced to us in response to our

21     subpoena.

Page 286

1          Do you see that this document states
2     your last day of work was September 6th, 2013?
3          A     I see that's what it says, yes.
4          Q     Do you recall if that's accurate?
5          A     I don't recall.
6          Q     Do you have a reason to question the
7     accuracy of Nordstrom's personnel records?
8          A     I don't know.  I just don't recall
9     these dates.
10          Q     And so if this is accurate then, you
11     were only employed by Nordstrom for about four
12     months.  Is that correct, if this document is
13     accurate?
14          A     If this document is accurate, yes.
15          Q     Do you remember if that's true, that
16     you were only employed there for about four months?
17          A     No.
18          Q     And Nordstrom is stating here in this
19     document that you were terminated for
20     dishonesty/theft.  Do you disagree with that?
21          A     No.

Page 293

1      You don't see female Pro sale specialists that

2      often, so they had made jokes.

3              Q      And they were your peers?

4              A      Yes.

5              Q      Was there any Lowe's manager who made

6      a comment about your gender?

7              A      Not that I recall.

8              MS. MANOS:  Let's take a quick break

9      now, I think, for the change of the tape.

10             VIDEOGRAPHER:  We are going off the

11     record.  This is the end of Media Unit Number 5.

12     The time is 4:24 p.m.

13              (Recess from 4:24 p.m. to 4:31 p.m.)

14             VIDEOGRAPHER:  We're back on the

15     record.  This is the beginning of Media Unit Number

16     6.  The time is 4:31 p.m.

17     BY MS. MANOS:

18             Q      Ms. De Leva, are you asserting a race

19     discrimination claim in this lawsuit?

20             A      Yes.

21             Q      What actions or decisions by Lowe's

Page 295

1          decision to terminate your employment was because

2          of your race?

3                    A      No, I don't.

4                    Q      Other than Mr. Nyswaner and

5          Mr. Lewis, are you claiming that another Lowe's

6          employee in a similar position to you of a

7          different race was treated more favorably?

8                    A      I'm sorry, can you ask me one more

9          time?

10                   Q      Other than Mr. Lewis and

11         Mr. Nyswaner, are you claiming there was a Lowe's

12         employee in a similar role to you who was treated

13         more favorably based on race?

14                   A      No.

15                   Q      Did any Lowe's employee make a

16         comment about your race?

17                   A      No.

18                   Q      Other than Mr. Lewis and Mr. Nyswaner

19         being a different race from you, what is the basis

20         of your race discrimination claim?

21                   A      Everybody in that -- in the --

Page 297

1          A     Yes.

2          Q     Are you asserting a national origin

3     discrimination claim in this case?

4          A     No.

5          Q     Do you know anything about Paul

6     Lewis' work history before he joined Lowe's?

7          A     He told me he was a plumber.

8          Q     Do you know how long he had been in

9     the Pro services sales specialist position before

10    you began that position?

11         A     He told me since 1999.

12         Q     Do you know how long Mr. Nyswaner was

13    a Pro services CSA with Lowe's?

14         A     He had mentioned it to me, but I

15    don't recall.  I believe it was under one year.

16         Q     Do you know which Lowe's employee

17    interviewed Mr. Nyswaner for the Pro services sales

18    specialist job?

19         A     I can't remember.

20         Q     Do you know if Mr. Nyswaner has a

21    bachelor's degree?

Page 299

1          they didn't arrest me.

2                  Q       So you believe Lowe's decision to

3          call local law enforcement was retaliation?

4                  A       Yes, putting together that whole

5          scenario of allegations of me and Pedro Andrade.

6                  Q       Do you know which Lowe's employee

7          made the decision to contact local law enforcement?

8                  A       No.

9                  Q       Do you believe that the termination

10         of your employment was retaliation?

11                 A       Yes.

12                 Q       And what do you think it was

13         retaliation for?

14                 A       Complaining about my pay.

15                 Q       Do you think it was retaliation for

16         your conversation with Scott Willis in March 2021

17         about the merit increase you received?

18                 A       Yes.

19                 Q       Was there another pay complaint or

20         concern you raised that you think it was

21         retaliation for?

Page 300

1          A     All of them.  All of the complaints

2     that I made since 2019.

3          Q     So you mentioned a conversation with

4     Jeffrey Bowden and with Scott Willis and you

5     mentioned an e-mail to John Rolison.

6                Was there another pay concern you

7     raised to Lowe's?

8          A     No.

9          Q     Do you have any documents to support

10    your belief that Lowe's decision to terminate your

11    employment was due to your pay concerns?

12         A     No.

13         Q     Did you ever express a pay concern to

14    Terrence Hopkinson?

15         A     No.

16         Q     Did you ever express a pay concern to

17    Chris Dang?

18         A     No.  He already knew.

19         Q     How do you know he already knew?

20         A     He questioned me about it the day I

21    was in that office, and I ended up having to put it

Page 304

1          A     Yes, when he returned back to the

2     company.

3          Q     And so he was not a manager at the

4     Frederick store at the time of this conversation?

5          A     No, he was an assistant manager at

6     the North Hagerstown store.

7          Q     Is there any other Lowe's manager

8     that you mentioned --

9          A     No.

10          Q     -- this discrimination to?

11          A     No.

12          Q     Are you claiming false imprisonment

13     in this case?

14          A     Yes.

15          Q     And what do you believe was -- they

16     did that was false imprisonment?

17          A     When they had me in the scheduling

18     office and Jasmine told me I couldn't leave and I

19     couldn't use my cellphone.  And it was hours in

20     there.  I couldn't go to the bathroom.

21          Q     And this was the meeting with Chris

Page 305

1      Dang about the asset protection investigation?

2           A     Yes.

3           Q     Did Mr. Dang make any statements to

4      you that suggested you were not free to leave the

5      room?

6           A     Chris Dang, I don't recall him saying

7      that I couldn't leave.

8           Q     Are you asserting a claim of abuse of

9      process in this case?

10          A     Yes, I believe that's on there.

11          Q     Are you claiming that Lowe's made

12     false statements to Frederick County Law

13     Enforcement?

14          A     Yes.

15          Q     What do you believe the false

16     statements were?

17          A     That I was stealing from the register

18     and passing off merchandise to a contractor.  I

19     wasn't charged till April 19th, I believe.  So in

20     the statement, it says that -- I know it's in here

21     somewhere that they showed the video.  I wasn't

Page 306

1       even shown the video by the officer.  But I believe

2       they gave false statements for Frederick County to

3       eventually, three weeks later, arrest me.

4               Q       So were you arrested at a later point

5       in time?

6               A       April 19th was on the paper, I

7       believe.  By April 21st, I received a letter that I

8       needed to pick up my summons at the Frederick

9       County Sheriff's Office, where I went and picked up

10      the summons, that I was being charged with those

11      two misdemeanor charges after I was told I was not

12      being charged -- or not being arrested on

13      March 29th, 2021 by the officer.  And . . .

14              Q       Do you have any evidence that Lowe's

15      shared anything with Frederick County Law

16      Enforcement other than the asset protection case

17      materials?

18              A       I'm sorry.  Do I have any --

19              Q       Do you have any evidence that Lowe's

20      shared anything with Frederick County Law

21      Enforcement other than the case materials from the

Page 307

1    asset protection case against you?

2         A    No.

3         Q    Are you claiming that Lowe's did

4    something improper after you were charged with the

5    theft crimes in Frederick County?

6         A    I believe Steven Robinson spoke to

7    his best friend at Floor & Decor.

8         Q    Oh, I don't mean to cut you off.  But

9    to clarify, I mean, did Lowe's -- did Lowe's do

10   something improper with respect to the criminal

11   process?

12             Are you claiming that there was

13   something with the criminal process in this case

14   against you that Lowe's did improperly after you

15   were charged?

16        A    I don't know.

17        Q    Are you asserting a claim of

18   intentional infliction of emotional distress in

19   this case?

20        A    Yes.

21        Q    What conduct by Lowe's are you

Page 336

1              CERTIFICATE OF NOTARY PUBLIC

2          I, FELICIA A. NEWLAND, CSR, the officer before

3      whom the foregoing videotaped deposition was taken,

4      do hereby certify that the witness whose testimony

5      appears in the foregoing deposition was duly sworn

6      by me; that the testimony of said witness was taken

7      by me in stenotype and thereafter reduced to

8      typewriting under my direction; that said deposition

9      is a true record of the testimony given by said

10      witness; that I am neither counsel for, related to,

11      nor employed by any of the parties to the action in

12      which this deposition was taken; and, further, that

13      I am not a relative or employee of any counsel or

14      attorney employed by the parties hereto, nor

15      financially or otherwise interested in the outcome

16      of this action.

17

18

19                    FELICIA A. NEWLAND, CSR

                    Notary Public

20

       My commission expires:

21      September 14, 2024

# View Form

🖨 ?

Candidate Form: Background Check - 1320181BR : Store Seasonal Employee - De Leva, Christine

## Lowe's New Hire Authorization and Release                                                ⌃

As part of our employment process, both when you are an applicant and at any time during employment with Lowe's:

We may request and get from LexisNexis Services Inc., a consumer report, that may contain the following about you: pending prosecutions, convictions, driving record, credit record, employment, education or reference information.

By proceeding with this release, you authorize Lowe's or its operating units to request a consumer report as described above. Also, you are releasing (agreeing not to sue) Lowe's, LexisNexis Services Inc.., or any other information provider consumer reporting agency contacted by Lowe's, any of their operating units, employees or officers, from all claims that you may have against them for providing information about you to Lowe's or any consumer reporting agency. This form is not an employment contract.

If hired, you have the right to end your employment at any time, and Lowe's reserves the same right.

The following requests for social security number, date of birth and/or driver's license information is strictly for identification purposes by the background check company only and will not be seen by the hiring manager.

## Background Check Form                                                                     ⌃

| Legal First | Legal Middle | Legal Last |
|---|---|---|
| Name: | Name: | Name: |

## Please provide any previous names. When providing this information please complete both first and last name used.                                                                     ⌃

| Previous Legal First | Previous Legal Last |
|---|---|
| Name: | Name: |
| Previous Legal First | Previous Legal Last |
| Name: | Name: |

**EXHIBIT**
12

DEF000001

Current Street Address:                                    Current City:

Current State:                                            Current Zip:

If you are a resident of CA, MN, or OK, you have a
right to request a copy of any consumer report
obtained as part of the pre-employment process.
If you are a resident of one of these states, do
you request a copy of any consumer report
obtained?:

# REDACTED

Date of Birth   09-Apr-1975
(dd/mm/yyyy):

Please answer the below for all states EXCEPT Massachusetts: The below will not include
minor traffic violations or a case that has been expunged, sealed, dismissed, erased,
pardoned or impounded.

Note: Answering yes will not necessarily disqualify a person's eligibility to work for Lowe's. Factors such as age and date of the offense, the
seriousness of the violation and rehabilitation will be considered.

Have you been convicted
of or plead guilty to or
nolo contendere to or no
contest to, a felony or
misdemeanor, including
DUI's & DWI's?:

DEF000002

Massachusetts Residents ONLY answer the below (For other than a first conviction for any of the following misdemeanors: drunkenness, simple assault, speeding, minor traffic violations, affray or disturbance of the peace) NOTE: Answering yes will not automatically disqualify a person from working at Lowe's.

Have you been convicted of a felony?:

If yes, please explain.:

If yes, please explain:

Have you been convicted of a misdemeanor within the past five years, or have you completed a period of incarceration within the past five years for any misdemeanor?:

## Below section should ONLY be completed if you have interviewed for a Driver position. All other positions leave blank.

Are you currently applying for a Driver position?:

Driver's License Number:

Driver's License State Abbreviation:

CDL Qualified:

I have carefully reviewed this authorization and release, acknowledge that I understand its contents, and consent to Lowe's obtaining the report(s) and information identified. I certify that the information supplied by me is true and correct to the best of my knowledge.:

DEF000003

Background Check - 1320181BR : Store Seasonal Employee - De Leva, Christine

  Do you have a Middle Name?:

## Form creation details ⌃

Date added:   23-Jan-2018

Added by:   Submission, System ()

DEF000004

# View Form

 ?

Candidate Form: Gateway questionnaire job response - External - US/1320181BR: Store Seasonal Employee - De Leva, Christine

External US Responsive - 20180111 : 5

## Résumé/CV

Christine De Leva
7417 Lake Katrine Terrace
Gaithersburg, MD 20879
United States
Home phone 240-506-6960
deleva.christine@gmail.com

**Experience**
2014 2018 The Home Depot Pro Account Sales Associate Resume attached

**Education**
2000 Associate's degree Montgomery County Community College Business Administration 3.5

Codes: 1320181BR 10072284

## Current Employee :0

Are you an employee of Lowe's?:  No

## Candidate Profile :0

Legal First Name:  Christine

Do you have a Middle Name?:  No

Legal Last Name:  De Leva



DEF000155

Email: deleva.christine@gmail.com

Address line 1: 7417 Lake Katrine Terrace

Country: United States

City: Gaithersburg

State/Region/Province: Maryland

Zip/Postal code: 20879

Primary Phone: 240-506-6960

Type: Cellular

What is the best way to contact you?: Phone

What is the best time to contact you?: Day

| Experience | Experience No. | Position or job title | Organization name | Start year | End year | Most recent |
|---|---|---|---|---|---|---|
| | 1 | Pro Account Sales Associate | The Home Depot | 2014 | 2018 | ✔ |

| Education | Education No. | School or Educational institution | Major or Area of study | Degree | GPA | Grad year | Most recent |
|---|---|---|---|---|---|---|---|
| | 1 | Montgomery County Community College | Business Administration | Associate's degree | | 2000 | ✔ |

Résumé/CV

## Additional Information :4

Are you 18 years of age or older?:  Yes

Do you have a legal right to work in the United   Yes
States?:

Can you provide such documentation?:  Yes

Are you still interested in working for Lowe's after   Yes
reading the information above on our drug screen
process?:

Are you willing to work on Sundays?:  Day

Are you willing to work on Mondays?:  Day

Are you willing to work on Tuesdays?:  Day

Are you willing to work on Wednesdays?:  Day

Are you willing to work on Thursdays?:  Day

Are you willing to work on Fridays?:  Day

Are you willing to work on Saturdays?:  Day

Select All Applicable Work Skills And Experiences   Cash/Money Handling
Which You Possess.:  Closing Sales
Credit Card Applications
Customer Service
Internet Sales/Fulfillment
Sales

Select All Areas In Which You Have Product   Commercial Sales
Knowledge or Experience.:

DEF000157

**LOCATION OF JOB:** None of the Above

Social Security Number:  REDACTED

Date of Birth (dd/mm/yyyy):  04/09/1975

## EEO :0

Gender:  Female

Primary Race/Ethnic Background:  White (not Hispanic or Latino)

Please select any additional race/ethnic backgrounds   Native Hawaiian or Other Pacific Islander (not Hispanic or Latino)
(Please be sure to hold down CTRL key to
select/deselect more than one option):

## Candidate Agreement ([Please review]) :1

PLEASE CHECK THIS BOX AS EVIDENCE THAT YOU   I agree
HAVE READ AND AGREE WITH THE ABOVE
STATEMENTS.:

## Form creation details

Date added:  23-Jan-2018

Added by:  Submission, System ()

DEF000158

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 531-2021-01723 |

**MARYLAND COMMISSION ON CIVIL RIGHTS** and EEOC
*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone | Year of Birth |
|---|---|---|
| **CHRISTINE DE LEVA** | **(240) 506-6960** | |

| Street Address | City, State and ZIP Code |
|---|---|
| **7417 LAKE KATRINE TER, MONTGOMRY VLG,MD 20879** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| **LOWE'S** | **201 - 500** | **(301) 668-3350** |

| Street Address | City, State and ZIP Code |
|---|---|
| **5611 BUCKEYSTOWN PIKE, FREDERICK, MD 21704** | |

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest       Latest |
| ☒ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN | **03-29-2021   03-29-2021** |
| ☐ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ GENETIC INFORMATION | |
| ☒ OTHER *(Specify)* **Equal Pay** | ☐ CONTINUING ACTION |

THE PARTICULARS ARE (*If additional paper is needed, attach extra sheet(s)*):
**I began my employment with the above referenced employer in February 2018, as a Pro Sales Specialist. I was paid less to my male colleagues Mr. Paul Lewis and Jeff Nyswaner, both white Caucasian that perform the same job responsibilities as I. I grieved my concerns to management, nothing was done. On March 29, 2021, Respondent cited erroneous reason that I violated policy and discharge me.**

**Respondent reason for my discharge was erroneous.**

**I believe I was discriminated against because of my sex (Female), and race (Asian), in violation of the Equal Pay Act of 1963 as amended and Title VII of the Civil Rights Act of 1964 as amended with respect to wages, harassment and discharge.**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Digitally signed by Christine De Leva on 04-08-2021 02:02 PM EDT** | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (*month, day, year*) |


EXHIBIT
17

**DELEVA-0142**

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

2. **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3. **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4. **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws).  Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination.  This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5. **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of.  Without a written charge, EEOC will ordinarily not act on the complaint.  Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed.  Charges may be clarified or amplified later by amendment.  It is not mandatory that this form be used to make a charge.

**NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW**

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA.  Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements.  You will be told which agency will handle your charge.  When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter.  Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so <u>within 15 days</u> of your receipt of its findings.  Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

**NOTICE OF NON-RETALIATION REQUIREMENTS**

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge.  Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an

DELEVA-0143

investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

| **AMENDED** CHARGE OF DISCRIMINATION | AGENCY | | CHARGE NUMBER |
|---|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | | FEPA | **531-2021-01723** |
| | X | EEOC | |

| Maryland Commission on Civil Rights | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| NAME*(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Christine De Leva | 240-506-6960 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 7417 Lake Katrine Terrace | Gaithersburg, Maryland 20879 | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| Lowe's Home Centers, LLC | 15+ | 301-668-3350 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 5611 Buckeystown Pike, | Frederick, Maryland 21704 | Frederick County |

| NAME | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

| CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))* | DATE DISCRIMINATION TOOK PLACE *EARLIEST (ADEA/EPA)* | *LATEST (ALL)* |
|---|---|---|
| X RACE   COLOR   X SEX   RELIGION   AGE | 08/01/2020 | 03/29/2021 |
| X RETALIATION   NATIONAL   DISABILITY   X OTHER *(Specify)* | | |
| ORIGIN | CONTINUING ACTION | |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I.  I began my employment for Respondent in February of 2018. I was employed as a Pro Sales Specialist ("PSS") since my promotion in approximately March 2019. Prior to that, I worked as a Pro Customer Service Associate. At all relevant times, I completed my job duties in a competent manner and met Respondent's reasonable expectations. At the time of my termination, I was ranked #1 in my District for sales and #3 in the Region in Pro Sales. I was accepted into the "Presidents Club" which is an exclusive club within the company for Pro Specialists that sell over one million dollars in pro sales for the year. In addition, two (2) weeks prior to my termination, I was awarded a Service Star for excellent performance.

II.  In June/July of 2019, Respondent promoted a white male employee (Jeff Nyswaner) to a PSS position from a Pro Customer Service Associate positon. I had already been working as a PSS for several months prior to Mr. Nyswaner's promotion. In September of 2019, Mr. Nyswaner openly shared his paystub with me and showed me he was earning more than I was even though I had more experience and had been in the PSS position longer. Immediately thereafter, I emailed and set up a time to speak with my District HR representative, Raman Kakar. I explained the situation to Mr. Kakar, including that I believed I was being discriminated against for being a female in a male-dominated industry. As a result of my complaint, Mr. Kakar indicated that I would receive a 10 cent raise and that "there was nothing else [he] could do for me."

III.  In October/November of 2019, I emailed my regional HR representative Mr. Rolison, and again expressed that I felt that I was being discriminated against because I was a female. I also complained that I was being discriminated against due to my ethnicity as a Pacific Islander. After a few weeks, I received a phone call from an individual in Lowe's corporate office which indicated that I would receive a lump sum payment to ameliorate the past pay discrepancy between myself and Mr. Nyswaner. In addition, I was informed during that time that my base pay would be adjusted to commensurate with Mr. Nyswaner's pay.                          *Continued...*

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| | X |
| 4/15/21   *Chittie Dle fue* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(ear)* |
| Date          Charging Party *(Signature)* | |
| X | |

EEOC FORM 5 (Rev. 12/93)

**EXHIBIT**
18

DELEVA-0125

IV. On March 2, 2021, I was informed by my Store Manager (Scott Willis) that I would be receiving a raise due to my excellent job with sales. I was told the raise would be posted on the following pay period. On March 25, 2021, the raise was posted. Also, at that time, I was informed by my direct supervisor, Jeffrey Bowden, that I was again paid less than all of the white males in the department. Mr. Bowden pulled up everyone's raise percentage and mine was lower than all of the white men. On March 26, 2021, I spoke with my Store Manager (Scott Willis) and informed him that I was disappointed with the raise and that I was again the lowest paid PSS. Mr. Willis said he would speak with his supervisor and get back in touch with me.

V. On March 29, 2021, I was approached by Chris Dang, District LP and was asked to join him in a back room with two other employees of Respondent. Mr. Dang then began interrogating me regarding a refund I did (without a customer present and under my supervisor's login credentials). I explained to him that it was customary in the store for PSS to do refunds both with, and without, the customer present and that my direct supervisor, Jeffrey Bowden, personally wrote his login credentials on a card that he gave me for the purposes of doing refunds when he was not available to do them. I then pulled the card out of my vest containing Mr. Bowden's handwriting and gave it to Mr. Dang who appeared frustrated after hearing my explanation and said "that my supervisor was breaking company policy by sharing that information with me." At that point, Mr. Dang switched the topic of conversation and began interrogating me regarding a long standing Pro Service Customer who owns a landscaping and contracting business that is well known in the store named Pedro Andrade.

VI. Mr. Dang began asking me questions regarding a prior transaction I performed for Mr. Andrade. Specifically, I rang Mr. Andrade up for several items he purchased, but not a trimmer and leaf blower. The explanation I gave to Mr. Dang regarding the encounter was that Mr. Andrade told me he had already paid for the leaf blower and trimmer at the customer service desk (which uses a different system). Mr. Dang insisted that Mr. Andrade did not purchase the trimmer and/or leaf blower, and as a result, that I failed to follow company policy and "validate his receipt."

VII. Shortly, thereafter the Store Manager (Scott Willis) came into the office and told me I was terminated and escorted me out of the store.

VIII. I believe the reason for my termination (not following company policy) was a pre-text for Respondent's actual motivations, to discriminate against me due to my sex (female) and my race (Asian) and/or to retaliate against me for complaining of pay discrepancies, discrimination, and for otherwise engaging in protected activity.

IX. I believe the "investigation" into Mr. Andrade and the trimmer/leaf blower incident was a sham and was designed to terminate me. Upon information and belief, Mr. Andrade paid for and purchased the trimmer and leaf blower. Respondent did not suffer any financial harm due to my actions in "failing to validate" Mr. Andrade's receipt. To date, Mr. Andrade has not been criminally charged/prosecuted for this incident.

X. I have been subjected to discrimination because of my sex (female) and race (Asian), in violation of Title VII of the Civil Rights Act of 1964, as amended and in violation of the Equal Pay Act of 1963, as amended with respect to wages, harassment, and discharge.

I solemnly affirm under the penalty of perjury that the contents of the foregoing paper are true to the best of my knowledge, information and belief.

| | |
|---|---|
| **From**: | De Leva, Christine [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6BD0F09B475D445E9E9745C9AD3BCBEE-2413608] |
| **Sent**: | 11/20/2019 10:57:44 AM |
| **To**: | Rolison, John [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=09ca0b46d0394242afc139712e24b6d9-rolison, jo] |
| **Subject**: | Christine De Leva - Store 516 - Concerns |

**Christine De Leva**
**Pro Sales Specialist**
**Lowe's of Frederick, #516**
**240.215.2658 (Direct Line)**
**christine.deleva@store.lowes.com**



EXHIBIT

22

---

**From:** Christine Deleva <deleva.christine@gmail.com>
**Sent:** Monday, November 11, 2019 6:35 PM
**To:** De Leva, Christine <christine.deleva@store.lowes.com>
**Subject:** [EXTERNAL] Christine De Leva - Store 516 - Concerns

*EXTERNAL SENDER*

Hello. My name is Christine De Leva. I am currently a Pro Sales Specialist for store 516 in Frederick, Md. I have been employed with Lowe's since February 2018. I started in store 223 in Gaithersburg, Md as a seasonal employee. I was offered a F/T position once the season ended as a Pro CSA and was promoted in February 2019 to a Pro Sales Specialist for store 516. My previous employer prior to Lowe's was our #1 competitor, The Home Depot. I was employed there from 2013-2018 as a Pro Account Sales Associate (PASA). My main accomplishments were with that company, as stated in my resume, were that I was #3 in the region for sales and #2 in the region for Pro Credit. I believe I have displayed these qualities while with this company thus far, as well. I am reaching out to you today because I am disconcerted as to why I am not being treated equally or fairly in my current department here with Lowe's. I feel I am being discriminated against because of my sex in this male dominated position and would like some answers.

In January 2019, my former ASM, Thelstan J. Rigby, reached out to me and informed me that a position was open in his store (516) for a Pro Sales Specialist. He had known about my background and wanted me on his team. I stated to him that I would be asking a pay of $20/hr. with my experience. He said he would make note of that. Shortly after we spoke, I applied for the position and was interviewed over the phone about a week later. I received a call from Thelstan the following week to offer me the job but said he was instructed by his current Store Manager, Gary Shanholtz, that he could only offer me a max pay of $16.77/hr. due to Frederick being a lower volume store than Gaithersburg. He assured me that he would raise my pay accordingly if I gave it a chance within the next year of doing well at 516. I accepted the position and started at the end of February 2019. After starting and getting to know my co-workers, the conversation of pay had come up. Listening to them speak of their pay, I wondered why my pay was so low. My District HR, Ramandeep Kakar, has an office in the back of our store so I decided to speak to him about my concerns. He said that my pay was determined by a pay rate advisor. I asked to see this and was told it was not something I could see but it is done by management to determine the rate of an employee's pay by calculating experience, etc. I mentioned to him that my co-workers had spoken about their pay at the desk and he said after looking into it, he could take my travel into consideration and raise my pay by $1.35 with back pay from when I first started at this store but that was the absolute max he could do. My Store Manager, Gary, apologized for not taking this into consideration when I was first hired. I received the increase and back pay on the following paycheck.

Sometime around May, our Pro CSA, Jeff Nyswaner, was promoted to a Pro Sales Specialist, as well, as one of our specialists transferred to another store closer to his home in Waynesboro, Pa. For the record, Jeff had also applied for the same position that I was hired for back in February but from what I was told by Thelstan, "Jeff did not have as much experience in Pro" therefore, I was the better candidate for the job at that time. Jeff had been a Pro CSA

at store 516 for about a year prior to being promoted and lives in the area. Last week, Jeff had his pay stub up on the computer screen for everyone to see and I couldn't help but notice that his pay rate was $20.19/hr. As I've already mentioned, this was the pay I had asked for when applying for the same position in February but was told I could not receive because this store did not have the volume to support this pay rate. This was very disturbing, and I immediately lost all trust in my management team at store level.  I feel I followed the correct protocol when it came to questions/concerns I had about my pay and I now truly believe I am being discriminated against because of my sex.

In closing, the resolution I am looking for is equal or appropriate pay. I would like to review my pay rate advisor to make sure all the information was entered correctly. If you are not the correct point of contact to address this issue accordingly, please advise me as to who I should be contacting about this unsettling matter.


Sincerely,


Christine De Leva
Store 516
Employee ID: 2413608

DEF001440

| From: | De Leva, Christine [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6BD0F09B475D445E9E9745C9AD3BCBEE-2413608] |
|---|---|
| Sent: | 11/21/2019 4:20:42 PM |
| To: | Mcwhirt, Mandi [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=52f2dbe85e614ff3925c45a30b4ff06f-mcwhirt, ma] |
| Subject: | Re: Christine De Leva - Store 516 - Concerns |

Good morning Mandi,

Thank you for your quick response. I hope to hear back from you soon.


Sincerely,


*Christine De Leva*
*Pro Sales Specialist*
*Lowe's of Frederick, #516*
*240.215.2658 (Direct Line)*
*christine.deleva@store.lowes.com*

---

**From:** Mcwhirt, Mandi <mandi.mcwhirt@lowes.com>
**Sent:** Thursday, November 21, 2019 7:31 AM
**To:** De Leva, Christine <christine.deleva@store.lowes.com>
**Subject:** FW: Christine De Leva - Store 516 - Concerns

Good morning Christine,

Thank you for reaching out with your concerns. I am the covering HR Director for you region as Mr. John Rolison has accepted another role within Lowe's. I wanted to ensure you that Lowe's open door policy allows all associates the chance to bring up concerns or suggestions to issues and receive the opportunity to discuss resolutions.
I will be partnering with associate relations in regards to your concerns to ensure all of your items are properly and thoroughly investigated.

Thank you again for reaching out and do not hesitate to let me know if you need anything during this process.


*Mandi McWhirt*

HR Director – Stores | Region 21 | PA, WV, OH, KY, IN
Office: 2100 Georgetown Dr. Suite 200 Sewickley, PA 15143 |
Office Phone: 724-934-6560 ext 202
ACC-1-844-HRLOWES





OFFICIAL SPONSOR OF THE NATIONAL FOOTBALL LEAGUE



EXHIBIT
23

Confidential

**From:** De Leva, Christine <christine.deleva@store.lowes.com>
**Sent:** Wednesday, November 20, 2019 5:58 AM
**To:** Rolison, John <john.rolison@lowes.com>
**Subject:** Christine De Leva - Store 516 - Concerns

*Christine De Leva*
*Pro Sales Specialist*
*Lowe's of Frederick, #516*
*240.215.2658 (Direct Line)*
*christine.deleva@store.lowes.com*

---

**From:** Christine Deleva <deleva.christine@gmail.com>
**Sent:** Monday, November 11, 2019 6:35 PM
**To:** De Leva, Christine <christine.deleva@store.lowes.com>
**Subject:** [EXTERNAL] Christine De Leva - Store 516 - Concerns

*EXTERNAL SENDER*

Hello. My name is Christine De Leva. I am currently a Pro Sales Specialist for store 516 in Frederick, Md. I have been employed with Lowe's since February 2018. I started in store 223 in Gaithersburg, Md as a seasonal employee. I was offered a F/T position once the season ended as a Pro CSA and was promoted in February 2019 to a Pro Sales Specialist for store 516. My previous employer prior to Lowe's was our #1 competitor, The Home Depot. I was employed there from 2013-2018 as a Pro Account Sales Associate (PASA). My main accomplishments while with that company, as stated in my resume, were that I was #3 in the region for sales and #2 in the region for Pro Credit. I believe I have displayed these qualities while with this company thus far, as well. I am reaching out to you today because I am disconcerted as to why I am not being treated equally or fairly in my current department here with Lowe's. I feel I am being discriminated against because of my sex in this male dominated position and would like some answers.

In January 2019, my former ASM, Thelstan J. Rigby, reached out to me and informed me that a position was open in his store (516) for a Pro Sales Specialist. He had known about my background and wanted me on his team. I stated to him that I would be asking a pay of $20/hr. with my experience. He said he would make note of that. Shortly after we spoke, I applied for the position and was interviewed over the phone about a week later. I received a call from Thelstan the following week to offer me the job but said he was instructed by his current Store Manager, Gary Shanholtz, that he could only offer me a max pay of $16.77/hr. due to Frederick being a lower volume store than Gaithersburg. He assured me that he would raise my pay accordingly if I gave it a chance within the next year of doing well at 516. I accepted the position and started at the end of February 2019. After starting and getting to know my co-workers, the conversation of pay had come up. Listening to them speak of their pay, I wondered why my pay was so low. My District HR, Ramandeep Kakar, has an office in the back of our store so I decided to speak to him about my concerns. He said that my pay was determined by a pay rate advisor. I asked to see this and was told it was not something I could see but it is done by management to determine the rate of an employee's pay by calculating experience, etc. I mentioned to him that my co-workers had spoken about their pay at the desk and he said after looking into it, he could take my travel into consideration and raise my pay by $1.35 with back pay from when I first started at this store but that was the absolute max he could do. My Store Manager, Gary, apologized for not taking this into consideration when I was first hired. I received the increase and back pay on the following paycheck.

Sometime around May, our Pro CSA, Jeff Nyswaner, was promoted to a Pro Sales Specialist, as well, as one of our specialists transferred to another store closer to his home in Waynesboro, Pa. For the record, Jeff had also applied for the same position that I was hired for back in February but from what I was told by Thelstan, "Jeff did not have as much experience in Pro" therefore, I was the better candidate for the job at that time. Jeff had been a Pro CSA at store 516 for about a year prior to being promoted and lives in the area. Last week, Jeff had his pay stub up on the computer screen for everyone to see and I couldn't help but notice that his pay rate was $20.19/hr. As I've

DEF001442

already mentioned, this was the pay I had asked for when applying for the same position in February but was told I could not receive because this store did not have the volume to support this pay rate. This was very disturbing, and I immediately lost all trust in my management team at store level.  I feel I followed the correct protocol when it came to questions/concerns I had about my pay and I now truly believe I am being discriminated against because of my sex.

In closing, the resolution I am looking for is equal or appropriate pay. I would like to review my pay rate advisor to make sure all the information was entered correctly. If you are not the correct point of contact to address this issue accordingly, please advise me as to who I should be contacting about this unsettling matter.


Sincerely,


Christine De Leva
Store 516
Employee ID: 2413608

Confidential

Message sent 3/8/2021 9:41:18 AM

I just spoke with Scott about my raise. He said raises were already put in about a week ago and that I would not be able to see it until probably the paycheck following this one coming up. I told him that I wanted to discuss what I needed and why. He said he gave me well over what the system suggested and to wait to see it. He said if I was not happy with what he gave me after seeing it, then we could have this conversation then. He also mentioned I was one of the very few people he overrode the system for and he hopes I'll be pleased.

Message received from Akiel Baptiste - RPSM Lowe's 3/8/2021 9:44:11 AM

**AL** Well that sounds very good! Hopefully it works out.

Message sent 3/8/2021 9:44:50 AM

Yes!

---
3/22/2021
---

Message sent 3/22/2021 1:54:18 PM

Hi I have a customer who needs a credit line increase on his LBA please:

Alwyn Doak
Custom Renovations
301-695-9136

Thanks

Message received from Akiel Baptiste - RPSM Lowe's 3/22/2021 4:38:06 PM

**AL** Sorry meeting all day I would work on this for you

---
3/23/2021
---

EXHIBIT
29

Message received from Akiel Baptiste - RPSM Lowe's 3/23/2021 7:35:57 AM

**AL** I forwarded the request to the underwriting team again for approval. I will let you know in a little while.

Message sent 3/23/2021 7:38:50 AM

Ok thanks

Message received from Akiel Baptiste - RPSM Lowe's 3/23/2021 7:42:07 AM

**AL** Anytime! How are you doing?

DELEVA-0015

Message sent 3/23/2021 9:17:07 AM

I'm doing alright. Waiting to see what this paycheck says on Wednesday lol

Message sent 3/23/2021 9:17:15 AM

How you been?

Message received from Akiel Baptiste - RPSM Lowe's 3/23/2021 9:32:10 AM

AL



Hopefully paycheck is good. I'm good no complaints. Hopefully you have a good day!

Message sent 3/23/2021 9:33:41 AM

Great I'll let him know thanks!

Message sent 3/23/2021 9:33:57 AM

I hope you do as well!

Message received from Akiel Baptiste - RPSM Lowe's 3/23/2021 9:34:12 AM

AL   Thanks

Message sent 3/23/2021 9:53:48 AM

Hey real quick.. what do I put in VSP when it's under $1500?

Message received from Akiel Baptiste - RPSM Lowe's 3/23/2021 10:12:01 AM

AL   AEP approve in the customer line

Message sent 3/23/2021 10:12:32 AM

Oh ok I think I just did AE lol